UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CLYDE F. MITTLEIDER, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> DAKOTA, MINNESOTA, AND ) <br> EASTERN RAILROAD; ) <br> CANADIAN PACIFIC RAILWAY ) <br> COMPANY; and ) <br> CANADIAN PACIFIC RAILWAY LTD., ) <br> ) <br> Defendants ) | CIV. 11-4054-KES <br><br><br> ORDER DENYING DEFENDANTS' <br> MOTION FOR SUMMARY <br> JUDGMENT |

Plaintiff, Clyde F. Mittleider, brought suit against defendants, Dakota Minnesota, and Eastern Railroad (DM&E), Canadian Pacific Railway Company (CP Company), and Canadian Pacific Railway Ltd. (CP Ltd.), claiming he is entitled to damages arising from promises made to him by DM&E. Defendants move for summary judgment, arguing that DM&E did not make an enforceable promise to Mittleider or, alternatively, that performance has been discharged. Separately, defendants CP Company and CP Ltd. (collectively, CP defendants) argue that they cannot be held liable for promises made by DM&E. For the following reasons, defendants' motion for summary judgment is denied.[1]

---

[1] Defendants request oral argument pursuant to D.S.D. Civ. LR 7.1, which provides that the court *may* order oral argument on a motion. Finding oral argument unnecessary to resolve this motion, defendants' request is denied.

**BACKGROUND**

The facts, viewed in the light most favorable to Mittleider, the nonmoving party, are as follows:

Mittleider began working as a conductor and brakeman for DM&E in 1987. In 1990, DM&E entered into a collective bargaining agreement setting out seniority rules for union members with the United Transportation Union (Union). At that time, Mittleider held brakeman, conductor, and engineer seniority. In 1996, DM&E promoted Mittleider to manager of train operations in Huron, South Dakota, which was a non-union position but still allowed Mittleider to retain and accumulate seniority.

In 2002, DM&E, through its wholly-owned subsidiary, Cedar American Rail Holdings, acquired the assets of I&M Rail Link and formed a new corporate entity called Iowa, Chicago, and Eastern Railroad (IC&E). During this acquisition period, DM&E was actively involved in recruiting and staffing employees who would work for IC&E.[2] Mittleider was one of these employees. Kevin Schieffer, DM&E's then-president, and Robert Brownell, DM&E's then-

---

[2] Immediately after the acquisition of I&M Rail Link, DM&E and IC&E had to be run separately until they received regulatory approval from the Surface Transportation Board to run the railroads under common control.

2

vice-president of operations,[3] approached Mittleider and offered him a position with IC&E as a superintendent in Mason City, Iowa. Mittleider was reluctant to accept the position because he feared he would lose his seniority status if he left DM&E and began working at IC&E. Believing Mittleider was the right person for the job, Schieffer and Brownell attempted, on multiple occasions, to convince Mittleider to accept the job offer. They promised Mittleider that if he accepted the IC&E position he would not lose his seniority status.[4] They also promised Mittleider that if he ended up losing his seniority status, he would be made whole. Based on these promises, Mittleider accepted the superintendent position with IC&E by signing an employment contract,[5] and he moved to Mason City, Iowa. Mittleider remained in that position until 2004, when he moved to Sioux Falls, South Dakota, after he was promoted to assistant chief

---

[3] Brownell eventually became the president of IC&E. Prior to Brownell becoming president of IC&E, Schieffer convinced Brownell to come out of retirement and hired him as vice-president of operations with the expectation that Brownell would assist in the acquisition of I&M Rail Link.

[4] This promise is evidenced by a letter—on DM&E letterhead—addressed to Mittleider from Brownell, in his capacity as DM&E's vice-president of operations, which stated, "This will confirm our discussion of the issue and that you will retain your position on the DM&E UTU Train and Engine Service Seniority Rosters as currently shown." Docket 66-3.

[5] The employment contract with IC&E contains an integration clause stating, "This document constitutes the entire understanding and agreement between the parties, and supercedes [sic] any previous written or verbal understandings or agreements of the parties." Docket 66-3 at 2. Noticeably, DM&E was not a party to the agreement.

transportation officer. This position had responsibilities associated with both DM&E and IC&E.[6]

After Mittleider accepted the position with IC&E, the Union demanded DM&E remove Mittleider from the seniority roster. DM&E refused, and the Union initiated a grievance that resulted in an arbitration proceeding, consistent with the collective bargaining agreement between DM&E and the Union, before Public Law Board Number 6820 (PLB). In August 2005, the PLB ruled that Mittleider's name would be removed from the seniority roster.

Following the PLB's decision, Mittleider again engaged in discussions regarding his seniority status with Schieffer, who was still acting as DM&E's president. Schieffer assured Mittleider that DM&E would honor its promise to him. At that time, Mittleider was working in a management position in which his seniority status did not matter, making immediate action unnecessary. Nonetheless, Schieffer, recognizing the commitment made by DM&E, Docket 74-3 at 6, told Mittleider that DM&E would continue to negotiate with the Union in an effort to have Mittleider placed back on the seniority roster and, if DM&E was unsuccessful, then Mittleider would be "taken care of." Docket 74-3 at 6.

---

[6] By this time, regulatory approval was given to operate DM&E and IC&E under common control.

Between 2007 and 2008, CP defendants acquired control of DM&E, IC&E, and Cedar American Rail Holdings. In a letter addressed to all DM&E, IC&E, and Cedar American employees from Fred Green, president and CEO of Canadian Pacific, Green stated, "CP purchased the equity of the DM&E, IC&E and Cedar American. The equity includes all contracts and all agreements, not just the assets of your organization." Docket 43-1 at 1. At some point during the acquisition period but before receiving approval from the Surface Transportation Board, CP defendants were informed of DM&E's "outstanding commitment that was made by Mr. Schieffer to Mr. Mittleider." Docket 74-4 at 7.

In 2010, Mittleider was informed that his position in Sioux Falls, South Dakota, would be terminated, and he was offered a management position in Minneapolis, Minnesota. Mittleider refused to accept the offer because he did not want to relocate to Minneapolis and because he believed he would forfeit his rights to be made whole for losing his seniority status if he accepted the position. Docket 74-2 at 6-7. Mittleider was also told that he could apply for a conductor position, which he refused for the same reasons. Shortly thereafter, Mittleider's employment with defendants ended.

Upon ending his employment, Mittleider asked defendants to compensate him for losing his seniority status as was promised under the agreement he

had with DM&E. Defendants refused, and Mittleider filed suit, alleging claims for breach of contract and promissory estoppel.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of his case on which he bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is precluded if there is a dispute in facts that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

Because this is a diversity action, the court applies the law of the state in which it sits, which here is South Dakota. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). Under South Dakota law, "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." SDCL 53-1-4. Because the evidence before the court does not easily lend itself to a choice of law determination and because the parties appear to agree that South Dakota law controls Mittleider's claims,[7] the court assumes without deciding that South Dakota law applies to Mittleider's claims.

## DISCUSSION

Mittleider alleges that DM&E, acting through its agents, made two separate promises to him that form the basis for his claims. The first promise was that Mittleider would not lose his union seniority status if he accepted the IC&E position. The second promise was that, if Mittleider did lose his seniority status as a result of taking the IC&E position, he would be "made whole," or in other words, compensated. As detailed above, Mittleider accepted the IC&E position, lost his seniority status, and has not been compensated for such.

As a result of defendants' refusal to compensate Mittleider for the loss of his seniority status, Mittleider asserts claims for breach of contract and

---

[7] Both parties cite South Dakota law extensively in their briefs.

promissory estoppel. Defendants argue that (1) there was never an enforceable contract between Mittleider and DM&E with the rights and obligations Mittleider is now attempting to enforce; (2) even if there was an enforceable contract, impracticability discharged their performance obligations; and (3) promissory estoppel does not apply under the circumstances here. Separately, the CP defendants argue Mittleider's claims can only be asserted against defendant DM&E, which is a separate corporate entity.

**I.     Proper Corporate Defendants**

Before delving into Mittleider's claims, the court first examines whether Mittleider can assert his claims against the CP defendants. CP defendants claim that any alleged agreement between Mittleider and DM&E cannot create liability for CP defendants because they are only parent corporations, not parties to the alleged agreement. Mittleider responds by arguing (1) that CP defendants acquired the debts and obligations of DM&E and thus are responsible for DM&E's performance obligations, or (2) that CP defendants are liable for DM&E's obligations under a "degree of control" theory.

Whether the CP defendants acquired the debts and obligations of DM&E depends on the corporate transaction—e.g., via a merger, stock purchase, or asset purchase—the CP defendants used to acquire DM&E. There is a dispute between the parties regarding this issue. *See* Docket 72 at 5. Defendants claim DM&E was acquired through a merger in which an indirect subsidiary was

merged with and into DM&E.[8] Mittleider, on the other hand, directs the court to a letter sent by Fred Green, President and CEO of Canadian Pacific,[9] in which Green states, "CP purchased the equity of the DM&E, IC&E and Cedar American. The equity includes all contracts and all agreements, not just the assets of your organization."[10] Docket 43-1 at 1. Nothing else in the record provides conclusive proof as to the corporate transaction used. Because the type of corporate transaction the CP defendants used to acquire DM&E frames the entire issue of whether the CP defendants are liable for DM&E's obligations and because there is a question of material fact as to the type of transaction used, summary judgment is denied on this issue.

## II. Breach of Contract Claims

Mittleider alleges defendants breached two promises made to him: (1) that he would retain his seniority status in the event he accepted the IC&E position, and (2) in the event he lost his seniority status after accepting the

---

[8] If such is the case, it seems unlikely that the CP defendants would be liable for DM&E's obligations because DM&E would still be in existence.

[9] Because the letterhead only identifies "Canadian Pacific," it is unclear whether Green is the President and CEO of CP Company, CP Ltd., or both.

[10] "A contract obligation is ordinarily due only to those with whom it is made, and generally corporations purchasing assets of other corporations will not be subject to the sellers' liabilities." *Parker v. W. Dakota Insurers, Inc.*, 605 N.W.2d 181, 184 (S.D. 2000). Nonetheless, there are certain situations in which the purchaser assumes the obligations of the seller. *Id.* "The conduct and representations of parties to a transaction may suggest intent by the acquiring company to assume the liabilities of the selling corporation." *Id.* at 186.

IC&E position, that he would be made whole. Defendants argue that the promises are not enforceable because there was a lack of consideration, there was a lack of mutuality, and the doctrine of impracticability discharged performance.[11] Separately, defendants argue the "make whole" promise was vacated by Mittleider's employment contract with IC&E.

### A.     Consideration

A valid and enforceable contract requires "sufficient cause or consideration." SDCL 53-1-2. "Any benefit conferred or agreed to be conferred upon the promiser by any other person to which the promiser is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser, is a good consideration for a promise." SDCL 53-6-1. "Moreover, contractual consideration may 'move' to the benefit of someone other than the one making or receiving a promise." *Harms v. Northland Ford Dealers*, 602 N.W.2d 58, 63 (S.D. 1999).

Defendants argue consideration was lacking because DM&E did not receive any benefit from Mittleider accepting employment with IC&E. Facts in the record suggest otherwise. At the time of the alleged promise, DM&E was in the process of acquiring I&M Rail Link (which was renamed IC&E following

---

[11] While the parties analyzed the two promises separately, the court analyzes them together to avoid unnecessary repetition because much of the analysis applies equally to both promises.

DM&E's acquisition) through its wholly-owned subsidiary, Cedar American Rail Holdings. Docket 74-1 at 3. As a parent company, DM&E had financial interests in both the transition of the I&M Rail Link to IC&E and the ultimate success of IC&E. This is evidenced by the fact that DM&E enticed its own employees, including Mittleider, to transition over to IC&E. Thus, facts support the notion that DM&E benefitted from Mittleider's promise to accept employment with IC&E.

Even if DM&E did not benefit from Mittleider's employment with IC&E, Mittleider suffered prejudice by leaving his position at DM&E. *See* SDCL 53-1-3 (identifying that "any prejudice suffered or agreed to be suffered . . . is a good consideration for a promise"). Not only did Mittleider change jobs, but he also needed to relocate from Huron, South Dakota, to Mason City, Iowa. Indeed, Mittleider was very reluctant to leave his position at DM&E and only did so after receiving promises from DM&E. Docket 74-2 at 9. Thus, the prejudice suffered by Mittleider was sufficient to satisfy the consideration requirement. *See Clement v. Rowe*, 146 N.W. 700, 701 (S.D. 1914) ("Damage to the promisee constitutes as good a consideration as benefit to the promisor.").

Additionally, there is no dispute that IC&E benefitted from the agreement because Mittleider accepted employment with IC&E. Because contractual consideration may 'move' to the benefit of someone other than the one making or receiving a promise, *Harms*, 602 N.W.2d at 63, consideration existed here

11

even if DM&E did not directly benefit from the consideration because it moved to the benefit of IC&E.

Defendants also contend that DM&E did not bargain for Mittleider to accept employment with IC&E. Consideration for a contract must be accepted and regarded as such by both parties. *Richter v. Indus. Fin. Co.*, 221 N.W.2d 31, 34 (S.D. 1974) ("It is a recognized principle of law that nothing is consideration for a contract that is not accepted or regarded as such by both parties."). Both Schieffer and Brownell, acting in their capacities as DM&E's president and vice president of operations, respectively, attempted to and ultimately did persuade Mittleider to accept the position with IC&E with the promise that Mittleider's seniority status at DM&E would be protected. Dockets 74-1 at 3; 74-2 at 3; 74-3 at 4. And there is no indication that either Schieffer or Brownell were acting outside the scope of their employment duties during these discussions with Mittleider. Therefore, facts show that DM&E bargained for the consideration it received.

In sum, Mittleider brought forth sufficient facts to show that valid consideration existed to support the alleged contract, and DM&E bargained for the same.

### B. Mutuality

Defendants next contend that the contract fails for lack of mutuality because Mittleider was not obligated to accept the IC&E position. This

argument fails because the South Dakota Supreme Court has stated that "the doctrine of mutuality has been generally abandoned." *Culhane v. W. Nat'l Mut. Ins. Co.*, 704 N.W.2d 287, 293 (S.D. 2005). So long as valid consideration exists—which it did here as discussed above—there is no additional requirement of "mutuality of obligation." Restatement (Second) of Contracts § 79 (1981) (cited with approval by the South Dakota Supreme Court in *Culhane*, 704 N.W.2d at 293). Moreover, mutuality existed here. Simply put, Mittleider promised to accept employment with IC&E, and DM&E promised to retain Mittleider's seniority status or compensate him if it was unable to do so.

### C. Doctrine of Impracticability

Defendants also argue that the PLB's determination that stripped Mittleider of his seniority status discharged DM&E from performance. The South Dakota Supreme Court analyzed the doctrines of impracticability and commercial frustration in *Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 165-68 (S.D. 1987). "Impracticability focuses on occurrences which greatly increase the costs, difficulty, or risk of the party's performance. Frustration . . . focuses on a party's severe disappointment caused by a frustration of his principle purpose in entering the contract." *Id.* at 167. Each theory requires the occurrence or non-occurrence of some unforeseen event, and the event must make performance impracticable or severely frustrated. *Id.* at 165-67.

Defendants claim the event here that discharged their performance was the PLB's arbitration decision.

It would be disingenuous for DM&E to claim that it was unaware that the PLB had the authority to strip Mittleider of his seniority status considering DM&E had been operating under the collective bargaining agreement since 1990. Moreover, the agreement of the parties specifically provided for performance in the event that Mittleider lost his seniority status, i.e., he would be made whole. Therefore, not only was the PLB's decision foreseeable at the time the parties entered into the contract, but DM&E's performance was not severely frustrated or made impracticable by the PLB's decision.

D.    **Effect of IC&E Employment Contract**

Defendants argue that Mittleider's employment contract with IC&E precludes enforcement of the make whole promise because the employment contract contains an integration clause. DM&E, however, was not a party to the employment contract. And defendants stress the fact that IC&E and DM&E are separate entities. Defendants have failed to identify how the integration clause in the contract between IC&E and Mittleider affected the rights and obligations that existed between Mittleider and DM&E.

To summarize, Mittleider brought forth sufficient facts to establish the existence of a contract between himself and DM&E in which DM&E promised Mittleider that he would not lose his seniority status if he accepted employment

with IC&E or that he would be compensated if he did. Defendants failed to identify a reason why their performance under the contract should be excused. Therefore, summary judgment is denied to defendants on Mittleider's breach of contract claims.

### III.   Promissory Estoppel

With respect to Mittleider's promissory estoppel claim, defendants again direct the court to the employment contract entered into between Mittleider and IC&E and claim that the contract precludes Mittleider's promissory estoppel claim. But defendants fail to identify how the employment contract entered into with IC&E affected DM&E's obligations owed to Mittleider when DM&E was not a party to the contract. Thus, it is unclear how the IC&E employment contract would preclude a promissory estoppel claim against DM&E.

Separately, defendants argue Mittleider's reliance on DM&E's promises was unreasonable because he knew that the PLB could ultimately strip him of his seniority status. Promissory estoppel requires the promisee "to have acted reasonably in justifiable reliance on the promise made." *Hahne v. Burr*, 705 N.W.2d 867, 873 (S.D. 2005). The deposition testimony of Mittleider, Schieffer, and Brownell indicate that those three individuals had lengthy discussions about Mittleider's ability to retain his seniority status. And it seems that DM&E, acting through Schieffer and Brownell, represented that it would use

its best efforts to ensure Mittleider's seniority status would go unchanged. Acting upon such a promise is not so unreasonable as to find against Mittleider as a matter of law when considering the fact that DM&E would have had substantially more bargaining power when it came to the issue of Mittleider's seniority status than Mittleider would have had on his own. Because DM&E would have had substantial bargaining power with the Union, Mittleider acted reasonably in believing DM&E could honor its promise of retaining his seniority.

Regardless, defendants' argument ignores the fact that DM&E also promised to compensate Mittleider in the event he lost his seniority status and that Mittleider relied on both promises when he accepted employment with IC&E. This additional promise makes Mittleider's reliance even more reasonable. When viewing the facts in favor of Mittleider, the court cannot find that Mittleider acted unreasonably, as a matter of law, when he relied on DM&E's promises. Therefore, summary judgment is denied to defendants on Mittleider's promissory estoppel claim.

## CONCLUSION

Mittleider brought forth sufficient facts to establish an enforceable contract existed between himself and DM&E in which DM&E promised to compensate Mittleider in the event he lost his seniority status. Defendants were unable to prove, as a matter of law, that performance under the agreement was

16

discharged. Also, assuming the facts in favor of Mittleider, Mittleider's reliance on DM&E's promises was reasonable such that his claim for promissory estoppel survives summary judgment.

Separately, there is a material question of fact regarding whether the CP defendants can be held liable for agreements entered into by DM&E. Accordingly, it is

ORDERED that defendants' motion for summary judgment (Docket 63) is denied.

Dated March 19, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE